BROWN, C.J.
*435 Defendant, Kelvin Demarcus Brown, II, was charged by grand jury indictment with second degree murder, in violation of La. R.S. 14:30.1. After a bench trial, Defendant was found guilty as charged and sentenced to life imprisonment without the benefit of probation, parole, or suspension of sentence. On appeal, Defendant challenges the sufficiency of the evidence and argues that the trial court erred in allowing certain La. C.E. art. 404(B) evidence and impermissible hearsay to be admitted at trial. Defendant has also filed a pro se brief raising additional assignments of error. For the following reasons, Defendant's conviction and sentence are affirmed.
FACTS
In the early hours of December 6, 2014, Officer Kevin Duck of the Shreveport Police Department was dispatched to a residence at 2903 Oak Forest Lane, Shreveport, Louisiana. Upon arriving at the scene, Officer Duck made contact with the victim, Alicia West, who had received multiple knife wounds to her body and throat. While they were waiting for an ambulance, Ms. West advised Officer Duck that she had been attacked by Defendant. Ms. West died shortly after her arrival at the hospital.
On January 22, 2015, Defendant was charged by grand jury indictment with the first degree murder of Alicia West. An amended indictment was filed on March 31, 2015, reducing the charge to second degree murder. At arraignment, Defendant pled not guilty and elected to have a jury trial. On March 15, 2017, however, Defendant waived his right to a jury trial and opted for a trial by judge.
Defendant's bench trial commenced on October 30, 2017. Exa Bloomer, the victim's mother, testified that she was asleep at her daughter's house because Ms. Bloomer was babysitting her grandson on December 6, 2014. Around 4:00 a.m. that morning, Ms. Bloomer woke up to the sound of water running outside. Ms. Bloomer called Ms. West, who was at work, and told her that someone had turned the water on outside. Ms. West advised her mother not to go outside and said that she would call the police first. Ms. Bloomer got up and waited until she saw Ms. West's vehicle pull into the driveway. Ms. Bloomer testified that she suddenly heard Ms. West screaming. Ms. Bloomer went outside into the carport and saw Defendant on top of her daughter's back. Ms. Bloomer stated that the carport light was on, and she recognized Defendant because he and Ms. West had previously dated. Defendant jumped up when he saw Ms. Bloomer and looked directly at her. Defendant then fled into a wooded area near the home. Ms. West stood up but was bleeding profusely, and she fell back toward her vehicle. The police arrived shortly thereafter. Ms. Bloomer's grandson appeared at the carport door and began screaming at the sight of his mother's bleeding body. Ms. Bloomer took her grandson back into the house as instructed by officers and tried to console him. After the incident, Ms. Bloomer was interviewed by the police. She identified Defendant in open court as the man who attacked Ms.West.
On cross-examination, Ms. Bloomer admitted that she was unable to pick Defendant out of a photographic lineup during her interview with the police. Ms. Bloomer is completely blind in her right eye, but she said that she was standing approximately four feet from Defendant when he attacked her daughter and could clearly see that the assailant was Defendant.
*436 Monique Bradley testified that she lives in Coushatta, Louisiana, and has known Defendant since 2007 when they were both at Northwestern State University. On December 6, 2014, Defendant came to the home she shared with an aunt early in the morning and asked if he could stay there for a few hours before he went to visit his child. Ms. Bradley got her aunt's permission for Defendant to stay, and Defendant took a nap in Ms. Bradley's room before leaving at about 9:00 a.m. Before leaving, Defendant told Ms. Bradley that if anyone came looking for him, she was to tell them that he had been with her. At the time, Ms. Bradley did not know what Defendant was referring to. She noted that it was not unusual for Defendant to arrive unannounced at her home, but it was not typical for him to come to her home that early in the morning. Defendant returned to Ms. Bradley's home later that afternoon when several other people were present. Ms. Bradley testified that Defendant had conversations with people and played with her niece. According to Ms. Bradley, Defendant did not appear to be worried and told her that he would return the following day to eat. Ms. Bradley got a text from a friend who is a police officer in Natchitoches later that evening notifying her that Defendant had been arrested for murder. Ms. Bradley contacted the police after she realized that defendant had been to her house that day. Defendant had left a green army-type bag at Ms. Bradley's home, which the police collected as possible evidence. Ms. Bradley testified that she thought the bag only contained a pair of boxers and a muscle shirt.
Ebony Morgan testified that she met Defendant when they were both employed at the Horseshoe Casino in 2013. Ms. Morgan and Defendant became friends while working together, but she had not been in contact with Brown for a month or two prior to December 6, 2014. Ms. Morgan testified that on that morning, she had called Defendant around 2:00 a.m. while she was headed home because she wanted to be on the phone with someone until she was safely in her home. Defendant called her back at 5:00 a.m., but she did not answer. Around 7:00 a.m., Ms. Morgan called Defendant a second time, and he sounded sleepy. Ms. Morgan testified that she did not see Defendant on December 6, 2014. Ms. Morgan testified that she did not know the victim but one her coworkers did. Ms. Morgan learned of Alicia. West's death that morning when Ms. Morgan got to work.
Corporal John Madjerick, a crime scene investigator with the Shreveport Police Department, testified that he was dispatched to Ms. West's home to collect evidence. Upon his arrival at the scene, Cpl. Madjerick made contact with Detective Joseph Brown to obtain a brief summary of the events and to do a walk-through of the scene. Ms. West had already been transported to the hospital prior to Cpl. Madjerick's arrival. Cpl. Madjerick took photographs of the scene, which he identified in open court. Ms. West's vehicle was at the scene, and the photographs depict her blood on the driveway. Ms. West's wig and a pool of her blood were located toward the rear of her vehicle, indicating the spot where she collapsed before being transported to the hospital. While photographing the home's exterior, Cpl. Madjerick observed an outside spigot and noted wet ground beneath it, indicating that it had recently been used. A black skullcap found in the grass near the corner of the home was collected and sent to the North Louisiana Crime Lab for testing.
Droplets of blood found near the skullcap traveled toward the partial chain link fence on the side of the home. Cpl. Madjerick testified that the blood found at the scene continued from the grassy area near *437 the partial chain link fence and ended at the driveway where Ms. West collapsed and the blood pooled. A portion of a window screen had been cut, and Cpl. Madjerick recovered a latent fingerprint from the window. The print was later determined to be of non-comparison value. No other fingerprints were recovered from the scene.
Cpl. Madjerick also took photographs of Ms. West after she died, which he also identified in open court. The photos show the numerous wounds suffered by the victim during the attack and several of her tattoos, including a tattoo of Brown's full name, "Kelvin D. Brown, II," above her pubis.
Monnie Michalik, an expert in forensic DNA analysis, performed a DNA analysis on the following items recovered from the scene: the black skullcap, a bloodstain card from the victim, reference swabs taken from Defendant, and a swab taken from the surface of a knife blade. Ms. Michalik completed one report in April 2015, but wrote a second report in June 2015 when additional evidence was analyzed. She stated that a partial Y-chromosome profile was found on suspected blood swabbed from the black skullcap, indicating that the cap had been worn by a man of Defendant's paternal lineage at some point. Due to the incomplete nature of the partial profile, Ms. Michalik was unable to definitively match it to Defendant; however, the partial profile was consistent with Defendant's DNA profile.
Victor Cooks testified that he knew Defendant through Alicia West and through serving in the National Guard with Defendant during their annual training in June of 2014. Cooks met Ms. West in February of 2014 when they both worked at the El Dorado Casino. Cooks and Ms. West began dating in November 2014, and, while they were dating, Defendant would frequently visit Ms. West's home unannounced late at night or early in the morning. Defendant would bang on the doors and windows, scream outside, and demand that Ms. West answer the door. Cooks testified that Ms. West appeared frightened during these incidents. Ms. West told Cooks that she did not understand why Defendant kept coming to her home, and that she obtained a restraining order against Defendant. Each incident lasted between 30 minutes and an hour. Defendant contacted Cooks via Facebook Messenger in November 2014 and informed him that Defendant was no longer interested in dating Ms. West but he still wanted to be in her life. In the messages, Defendant referred to pending charges of stalking and cyberstalking Ms. West had filed against him. Defendant accused Ms. West of making up the allegations and told Cooks to tell Ms. West to drop the charges. Defendant further messaged, "[Alicia West] is the main reason I spent five days in prison." Defendant also inquired whether Ms. West blamed him for setting a house fire.
Cooks testified that he saw Ms. West on December 6, 2014, at approximately 2:00 or 3:00 a.m. while she was working at the Margaritaville Casino. Ms. West told him that she was going out with friends for a drink after work. Cooks saw Ms. West again shortly before she left work, and she appeared frantic because her home alarm was going off. Cooks was contacted by the police later that morning and was told of Ms. West's death.
Officer Duck testified that he was dispatched to Ms. West's home on December 6, 2014, at 4:32 a.m. in response to a call from a lady wanting her water spigots fingerprinted. When he initially received the call, there was no information that there had been an assault. Upon arriving at the scene, Officer Duck saw Ms. West's son first, then her mother. Officer *438 Duck saw Ms. West coming from around the home's east side, stumbling toward him and clutching her neck. Officer Duck testified that when the victim fell to the ground, he could see her spinal cord through the wound in the front of her neck. Officer Duck asked Ms. West who attacked her, and she told him twice that it was Kelvin Brown. He also asked her what weapon her attacker used, and her response was "a knife."
Footage from Officer Duck's police vehicle camera was admitted into evidence and played at trial. In the video, Ms. West can be heard telling Officer Duck that she was attacked by Defendant with a knife. Officer Duck can also be heard telling the ambulance to hurry and instructing the victim's mother and son to go back inside to preserve the crime scene. Officer Duck begins to pray with Ms. West prior to the arrival of emergency services. Ms. West's mother can also be heard relaying what had occurred to Officer Duck. When asked whether she saw Defendant, Ms. West's mother stated, "I saw a person running." She further stated that she didn't "really, really see him." Officer Duck testified at trial that he believed what Ms. West's mother meant was that she could not see Defendant clearly as he ran away toward the woods, as she had previously told him that she was able to see it was Defendant when she saw him under the carport.
Raquel Davis Alvarez, a friend of the victim's, testified that Ms. West introduced her to Defendant when all three worked at Sam's Town Casino about ten months to a year before Ms. West's death. Ms. Alvarez stated that Ms. West was not happy in her relationship with Defendant, and that Ms. West was trying to obtain a restraining order against him. Ms. West would occasionally stay at Ms. Alvarez's home because Ms. West did not feel safe at her own home. Ms. Alvarez testified that Defendant and Ms. West argued at work in front of her. Ms. Alvarez also loaned Ms. West a handgun for protection. According to Ms. Alvarez, Ms. West had no idea what Defendant might do, and she was scared for her own safety and that of her son.
Kimia Giles testified that she had previously been harassed by Defendant in February 2014 when both were serving in the National Guard. At the time, Ms. Giles was a private, and Defendant was the second lieutenant in charge of her unit. Ms. Giles stated that Defendant made frequent lewd and unwanted advances, even in the presence of others, texted her, and called her "sweetie." On one occasion, Defendant had blisters on his feet and asked Ms. Giles to nurse him back to health. Ms. Giles advised him to seek aid from a medic, but Defendant insisted that he wanted her assistance. Defendant also made insinuations that Ms. Giles owed him something as if he expected her to actually tend to his injuries. Ms. Giles informed another guardsman, who reported the incident on her behalf, and Ms. Giles filed a sexual harassment complaint. Ms. Giles did not see Defendant again after she filed the complaint.
Corporal Betsy Huey Pickett of the Shreveport Police Department testified that she was dispatched to Ms. West's home at 11:08 a.m. on November 2, 2014, in response to a stalking complaint. Ms. West informed Cpl. Pickett that she went outside and saw her water spigot running although she had not turned it on. Cpl. Pickett observed that the ground beneath the spigot was very muddy as if the tap had been on for quite some time. Cpl. Pickett advised Ms. West to obtain a restraining order against her stalker, to stay with family or friends, or to have someone stay with her so she would not be alone. Ms. West appeared very distressed and complained that the stalking was an ongoing problem.
*439 Lieutenant Shannon Mack with the Bossier Parish Sheriff's Office, an expert in historical cell phone data analysis, testified that she analyzed the cell phone records provided by AT & T Wireless.[1] Lt. Mack testified that cell phone number (318) 470-xxxx belonged to Ms. West and (318) 519-xxxx belonged to Defendant. Utilizing the records provided by AT & T and CellHawk software, Lt. Mack was able to determine that Defendant's cell phone was within 5,000 meters of the crime scene at 3:54 a.m. on the morning of December 6, 2014. For comparison, Lt. Mack stated that the cell phone records showed that Ms. West's cell phone was also within 5,000 meters of the crime scene at the time of the attack.
Officer Lee Scott, now retired from the Shreveport Police Department, testified that he met Ms. West when she filed a complaint against Defendant on November 4, 2014. At that time, Ofc. Scott was a supervisor with the Vice Unit. Ms. West reported that Defendant, without her consent, had placed Ms. West's cell phone number and photographs of her on Backpage.com, which is an escort web service used for prostitution. Defendant had also posted the same photographs on his Facebook page. According to Ofc. Scott, the photographs were intimate and provocative in nature, and Ms. West was very concerned. Ms. West related to Ofc. Scott that she was receiving phone calls from men seeking sexual favors. Ofc. Scott verified that the photographs on Defendant's Facebook page were the same as those on Backpage.com. Ofc. Scott then called Defendant, verbally advised him of his Miranda rights, and asked him about the photographs. Defendant denied all the accusations. Ofc. Scott had Ms. West call Defendant to advise him that she did not want to be contacted by him anymore. Ofc. Scott was present when Ms. West called Defendant, and as soon as Ms. West got off the phone with Defendant, he called her despite being asked not to. Ofc. Scott sought a warrant for Defendant's arrest.
Detective Joseph Brown, now retired from the Shreveport Police Department, was the lead investigator in Ms. West's death. Early in the morning of December 6, 2014, Brown was notified by dispatch of a stabbing at 2903 Oak Forest. Brown arrived at the home, made contact with the initial responding officers and was advised of Ms. West's dying declaration naming Defendant as her attacker. He also did a quick walk-through of the scene. Brown determined that the attack occurred a few minutes prior to 4:25 a.m. Brown obtained an arrest warrant for Defendant, who turned himself in the following afternoon. Defendant was advised of his Miranda rights, which he waived. During his interview, Defendant stated that at 2:40 a.m. on the morning of the attack, he received a call from Ebony Morgan. Thereafter, between 3:00 and 3:30 a.m., he met Ms. Morgan at the Save-A-Lot on Lakeshore Drive, and they had sex in the parking lot. At approximately 4:10 a.m., Defendant left Ms. Morgan and traveled to Natchitoches, Louisiana. Brown obtained Defendant's cell phone records pursuant to a search warrant and determined that the story that Defendant had given regarding his location at certain times the morning of the attack conflicted with his cell phone *440 records. Defendant's cell phone records revealed that, between 4:00 and 5:17 a.m., Defendant's phone was inactive (which means that the phone's physical location could not be determined for that period). The cell phone records revealed that at 5:17 a.m., when Defendant made a call to Ms. Morgan, he was still in Shreveport, not in Natchitoches as he had previously stated.
Detective Shonda Holmes testified that she works with the Shreveport Police Department's Domestic Violence Unit. Det. Holmes came in contact with Ms. West in November and December of 2014 when Ms. West accused Defendant of stalking and cyberstalking. Det. Holmes interviewed Ms. West on November 6, 2014. Ms. West related that Defendant was coming to her home unannounced, sending her text messages, stalking her, and showing up at her workplace. Det. Holmes obtained copies of the text messages and a voicemail Defendant left Ms. West. Det. Holmes noted that only one of the texts was from Ms. West, and it was a request by Ms. West to Defendant asking him to leave her alone. The messages from Defendant communicated that he was waiting outside Ms. West's home on several occasions, with questions as to whether a man was with her and whether she was okay.
Defendant was arrested by Lee Scott and interviewed by Det. Holmes on November 6, 2014. Portions of Det. Holmes' interview with Defendant were played at trial. In the recording, Defendant was advised of his Miranda rights. Defendant stated that he understood his rights and wished to make a statement. Brown told Det. Holmes that he and Ms. West had been dating since October of the previous year but had broken up. Defendant stated that Ms. West was communicating with him through a third party and denied attempting to contact her. Defendant admitted, however, that he texted her despite the break-up because it has worked in the past, i.e., they would get back together. Defendant was texting Ms. West that he was outside her house despite not being invited to her home on a given day. According to Defendant, he was "always invited." He also went to her work one day. Defendant stated that he spoke to a male coworker at West's job and asked him to relay to Ms. West that he wanted her to call him for closure. Defendant insisted that he was just a worried friend.
Dr. Long Jin, an expert in forensic pathology, testified that he performed Alicia West's autopsy. Dr. Jin stated that Ms. West suffered from multiple sharp-force injuries, which he explained were stabbing and slashing wounds. Ms. West suffered an injury to her tongue and had a superficial incised wound to her left cheek about three to four centimeters in length. Ms. West also had a long wound starting on the left side of her mouth and traveling down the left side of her neck. Dr. Jin documented additional incised wounds to her back left hand and posterior elbow. There was another sharp-forced injury on Ms. West's upper left arm that was two to three centimeters in length. Dr. Jin stated that in his professional opinion, the wounds were inflicted by a knife. There were no injuries to Ms. West's lower extremities. Dr. Jin noted the sutures on Ms. West's wounds and the incision under her left breast, noting they were made by emergency medical staff at the hospital after the attack. Because of the medical intervention, Dr. Jin could not determine whether the injury to the neck was one continuous wound, but he believed that the wound consisted of multiple stabbing and incised wounds. The weapon used in the attack cut Ms. West's internal jugular vein almost in half, resulting in loss of blood. Ms. West also suffered an injury to her trachea. Dr. Jin testified that Ms. West's *441 cause of death was the sharp-force wound to the left neck, and the manner of death was homicide.
On cross-examination, Dr. Jin stated that he believed the injuries to Ms. West's hands and arm were inflicted first, as if during a struggle. The fatal wound was most probably the last wound inflicted, which was the wound to Ms. West's neck.
The trial court found Defendant guilty as charged of second degree murder. On November 7, 2017, prior to sentencing, Defendant was asked whether he would like to make a statement; he declined. Defendant was subsequently sentenced to life imprisonment without the benefit of probation, parole, or suspension of sentence.
Defendant has appealed.
DISCUSSION
Sufficiency of the Evidence
Appellate counsel argues that Ms. West's dying declaration, naming Defendant as her attacker, should have been excluded as inadmissible hearsay as there was no evidence presented suggesting that Ms. West reasonably believed that she was dying. Counsel contends that the accusation made the police predisposed to suspect only Defendant as the attacker and, therefore, they failed to investigate other potential suspects. According to counsel, the record contains a list of police reports made by Ms. West dating back to 2003 in which she accused three other individuals of harassment. This list was not admitted into evidence at trial. In his pro se brief, Defendant also questioned the identity of Ms. West's attacker and added that the stabbing of Ms. West, taken alone, does not establish specific intent to kill.
The State argues that, in viewing the evidence in a light most favorable to the prosecution, the evidence establishes Defendant's guilt beyond a reasonable doubt.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ; State v. Tate , 01-1658 (La. 05/20/03), 851 So.2d 921, cert. denied , 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004) ; State v. Carter , 42,894 (La. App. 2d Cir. 01/09/08), 974 So.2d 181, writ denied , 08-0499 (La. 11/14/08), 996 So.2d 1086. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 05-0477 (La. 02/22/06), 922 So.2d 517 ; State v. Dotie , 43,819 (La. App. 2d Cir. 01/14/09), 1 So.3d 833, writ denied , 09-0310 (La. 11/06/09), 21 So.3d 297. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith , 94-3116 (La. 10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Eason, 43,788 (La. App. 2d Cir. 02/25/09), 3 So.3d 685, writ denied , 09-0725 (La. 12/11/09), 23 So.3d 913, cert. denied , 561 U.S. 1013, 130 S.Ct. 3472, 177 L.Ed.2d 1068 (2010).
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances *442 established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La. 1983) ; State v. Speed, 43,786 (La. App. 2d Cir. 01/14/09), 2 So.3d 582, writ denied , 09-0372 (La. 11/06/09), 21 So.3d 299.
In a bench trial, Louisiana law neither requires nor precludes a statement of reasons supporting the verdict returned by the court sitting as the fact finder in the case; however, if a trial judge chooses to do so, the statement of reasons may provide a useful guide to the appellate court for reviewing the sufficiency of the evidence under the Jackson standard. Jackson v. Virginia, supra ; State v. Marshall , 04-3139 (La. 11/29/06), 943 So.2d 362, cert. denied , 552 U.S. 905, 128 S.Ct. 239, 169 L.Ed.2d 179 (2007) ; State v. Thomas , 50,898 (La. App. 2d Cir. 11/16/16), 209 So.3d 234.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Allen , 36,180 (La. App. 2d Cir. 09/18/02), 828 So.2d 622, writs denied , 02-2595 (La. 03/28/03), 840 So.2d 566, 02-2997 (La. 06/27/03), 847 So.2d 1255, cert. denied , 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004). The pertinent inquiry in bench trials remains, as it does in jury trials, on the rationality of the result and not on the thought processes of the particular fact finder. State v. Marshall , supra. The trier of fact is charged to make a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness; the reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. State v. Casey , 99-0023 (La. 01/26/00), 775 So.2d 1022, cert. denied , 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000).
In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Gullette, 43,032 (La. App. 2d Cir. 02/13/08), 975 So.2d 753 ; State v. Burd , 40,480 (La. App. 2d Cir. 01/27/06), 921 So.2d 219, writ denied , 06-1083 (La. 11/09/06), 941 So.2d 35.
Second degree murder is when the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1(A)(1).
Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). As a state of mind, specific intent need not be proven as a fact, but may be inferred from the circumstances of the offense and the defendant's actions. State v. Thornton , 47,598 (La. App. 2d Cir. 03/13/13), 111 So.3d 1130. Specific intent to kill or inflict great bodily harm may be inferred from the extent and severity of the victim's injuries. State v. Murray , 49,418 (La. App. 2d Cir. 01/14/15), 161 So.3d 918, writ denied , 15-0379 (La. 04/08/16), 191 So.3d 582.
A review of the record reveals sufficient direct and circumstantial evidence to support Defendant's conviction of second degree murder.
The evidence presented at trial shows that the victim, Alicia West, made repeated complaints to the police regarding Defendant's harassing behavior, and that Defendant frequently visited Ms. West's home and work unannounced, *443 called, and texted her despite her request that he stop. Ms. West's friends, Cooks and Ms. Alvarez, testified to Ms. West's fear and frustration that Defendant continued to contact her even though she had filed police reports and obtained a restraining order against him. Ms. West's fear of Defendant was so great that she stayed overnight with Ms. Alvarez on several occasions because the victim was afraid of being alone. Ms. Alvarez even loaned Ms. West a gun for protection. Cpl. Pickett, Ofc. Scott, and Det. Holmes also observed the agitation and fear the victim endured as a result of Defendant's behavior. Statements made by Defendant in his interview with Det. Holmes corroborated Defendant's behavior despite his claim that he was merely acting as a concerned friend.
Defendant's statements to police regarding his whereabouts on the early morning of the attack conflicted with the testimony given by Ebony Morgan and the information provided by Defendant's cell phone records. Defendant claimed that he was with Ms. Morgan the morning that the victim was attacked, but Ms. Morgan testified that she spoke to Defendant only briefly on the phone and did not see him at all that morning. Defendant's claim that he was in Natchitoches at 5:17 a.m. on December 6, 2014, was refuted by his cell phone records, which placed him in Shreveport at that time. Lt. Mack testified that Defendant's cell phone records revealed that he was within 5,000 meters of the victim's home at 3:54 a.m., placing him near the crime scene approximately 30 minutes prior to the attack, which also refutes Defendant's claim that he did not go near Ms. West's home the morning of her brutal attack. Defendant's presence at the crime scene that morning was further established by the black skullcap that was found there and which testing established contained Defendant's paternal DNA.
Ultimately, the victim's dying declaration to Officer Duck, in which she named Defendant as her attacker, is sufficient to support Defendant's conviction. Ms. West's response to Officer Duck's question about the identity of her attacker can be heard clearly on the police vehicle video. Officer Duck corroborated Ms. West's statement at trial, noting that she named Defendant as her attacker twice. The evidence presented by the state, taken as a whole and viewed in a light most favorable to the prosecution, established Defendant's guilt beyond a reasonable doubt.
This assignment is without merit.
Other Crimes Evidence
Appellate counsel contends that Ofc. Scott's testimony regarding provocative photographs of the victim allegedly posted to Facebook and Backpage.com by Defendant constituted inadmissible other crimes evidence in violation of La. C.E. art. 404(B). At the time Ms. West reported the photographs, she accused Defendant of posting them; however, counsel argues that this was never proven at the time Ms. West made the report or at trial. Counsel further argues that Cpl. Pickett's testimony concerning another police report made by the victim, wherein she accused Defendant of stalking, also violated La. C.E. art. 404(B) and should not have been presented at trial. Counsel points out that Defendant's name was never mentioned in Ms. West's report, and the mere implication that Defendant was her alleged stalker was highly prejudicial to his case. Defendant further argues in his pro se brief that testimony from Det. Holmes regarding references to other accusations made by Ms. West against Defendant also violated La. C.E. art. 404(B) and constituted inadmissible hearsay.
The State contends that the testimony of these officers was necessary to prove motive, opportunity, intent, preparation, plan, *444 knowledge, identity, and absence of mistake or accident. The state further relies upon its previous argument that the testimony is part of res gestae and establishes a clearer narrative of the events leading to the victim's death.
La. C.E. art. 404(B)(1) provides:
Except as otherwise provided in La. C.E. art. 412, evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that it the subject of the present proceeding.
La. C. Cr. P. art. 720 further provides:
Upon written motion of defendant, the court shall order the district attorney to inform the defendant of the State's intent to offer evidence of the commission of any other crime admissible under the authority of Code of Evidence Articles 404 and 412.2. However, the order shall not require the district attorney to inform the defendant of the state's intent to offer evidence of offenses which relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding or other crimes for which the accused was previously convicted.
Generally, evidence of other acts of misconduct is not admissible because it creates the risk that the defendant will be convicted of the present offense simply because the unrelated evidence establishes him or her as a "bad person." State v. Jones , 50,270 (La. App. 2d Cir. 02/10/16), 188 So.3d 268, writ denied , 16-0858 (La. 05/01/17), 220 So.3d 742 ; State v. Richardson , 46,360 (La. App. 2d Cir. 06/22/11), 71 So.3d 492, writ denied , 11-1777 (La. 04/27/12), 86 So.3d 615. This rule of exclusion stems from the "substantial risk of grave prejudice to the defendant" from the introduction of evidence regarding his unrelated criminal acts. State v. Prieur , 277 So.2d 126 (La. 1973). Evidence of other crimes, wrongs, or acts may be introduced when it relates to conduct formerly referred to as res gestae that "constitutes an integral part of the act or transaction that is the subject of the present proceedings." La. C.E. 404(B) ; State v. Colomb , 98-2813 (La. 10/01/99), 747 So.2d 1074 ; State v. Jones, supra. Res gestae events constituting other crimes are deemed admissible because they are so nearly connected to the charged offense that the state could not accurately present its case without reference to them. State v. Colomb, supra. In State v. Colomb, 747 So.2d at 1075-76, the Louisiana Supreme Court observed:
This doctrine encompasses not only spontaneous utterances and declarations made before and after commission of the crime but also testimony of witnesses and police officers pertaining to what they heard or observed before, during, or after the commission of the crime if the continuous chain of events is evident under the circumstances. We have required a close connexity between the charged and uncharged conduct to insure that the purpose served by admission of other crimes evidence is not to depict the defendant as a bad man, but rather to complete the story of the crime on trial by proving its immediate context of happenings near in time and place.
(Citations omitted.)
The erroneous introduction of other crimes evidence is subject to harmless *445 error review. State v. Jones, supra ; State v. Gatti, 39,833 (La. App. 2d Cir. 10/13/05), 914 So.2d 74, writ denied , 05-2394 (La. 04/17/06), 926 So.2d 511. Trial error is harmless where the verdict rendered is "surely unattributable to the error." State v. Johnson , 94-1379 (La. 11/27/95), 664 So.2d 94.
We find that the trial court properly admitted the testimony of Cpl. Pickett, Ofc. Scott, and Det. Holmes about the complaints filed by the victim accusing Defendant of stalking and cyberstalking.
On April 1, 2016, the State filed a notice of intent to introduce other crimes evidence pursuant to La. C.E. art. 404(B) and La. C. Cr. P. art. 720. On July 22, 2016, a hearing was held during which Ofc. Scott, Cpl. Pickett, Det. Holmes, Cpl. Justin Metzger, and Colonel Cameron Lance Magee were interviewed about potential other crimes evidence against Defendant. The hearing was continued until November 15, 2016, on which date, due to new pro se motions filed by Defendant, the matter was continued again to January 10, 2017. On that date, the trial court found the statements to be admissible under La. C.E. art. 404(B), ruling:
The victim made the complaint, according to the testimony, was able to identify the defendant as the person in question or that was the subject of the complaint. The testimony meets the require [sic] of 404(B) and those-that testimony will be admissible.
As noted in State v. Colomb, supra , other crimes evidence is admissible at trial when used to complete the story of the crime on trial by proving its immediate context of happenings near in time and place. Because the victim named Defendant as her attacker, the testimony of these police officers clearly establish that Defendant had a history of showing up at Ms. West's home unannounced at unusual hours of the day and night. For instance, during his interview with Det. Holmes, Defendant repeatedly stated that he would drive to Ms. West's home and wait outside for her. Defendant further indicated that he made numerous attempts to reach her by phone and text, describing his efforts as "friendly" and made to ensure that she was okay. Without the testimony of these officers, Defendant's attack on the victim at approximately 4:25 a.m. on December 6, 2014, would appear arbitrary and random. The testimony at issue demonstrates a pattern of behavior by Defendant that renders his early morning attack on the victim much more plausible. Cpl. Pickett's testimony about Ms. West's accusation that Defendant had previously turned on the outside water spigots of her home is particularly relevant, given that the water spigot was turned on the night of the attack, possibly to lure someone out of the home.
Even if the evidence was erroneously admitted at trial, the error appears harmless in light of Ms. West's dying declaration and other overwhelming evidence establishing Defendant's guilt.
This assignment is without merit.
Hearsay Testimony
Appellate counsel argues that the statements made by Victor Cooks, Raquel Alvarez, and Cpl. Pickett, in which they asserted that Ms. West told them that she obtained a restraining order against Defendant and did not feel safe because of his conduct, constituted inadmissible hearsay and should not have been permitted at trial. According to counsel, the State's reliance on hearsay exceptions of state of mind and res gestae was misplaced, and no evidence was presented to support either statement's admission. Such admissions violated Defendant's right to confront a witness (the victim) against him, *446 thus violating his Sixth Amendment rights. Defendant adopts counsel's argument in his third pro se assignment of error. In his fourth pro se assignment of error, Defendant further argues that the trial court erred in admitting the victim's dying statement to Officer Duck in which she related that Defendant was her attacker.
The State argues that the statements are admissible because they indicate Ms. West's state of mind in the weeks leading up to her death, as well as provide evidence concerning prior ill feelings and hostility between Defendant and the victim.
Hearsay is an oral or written assertion, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted. La. C.E. art. 801(A)(1) and (C). Hearsay evidence is not admissible, except as otherwise provided by the Code of Evidence or other legislation. La. C.E. art. 802 ; State v. Wade , 39,797 (La. App. 2d Cir. 08/09/05), 908 So.2d 1220, writs denied , 06-0109, 06-0148 (La. 06/02/06), 929 So.2d 1251.
Hearsay is excluded because the value of the statement rests on the credibility of the out-of-court asserter, who is not subject to cross-examination and other safeguards of reliability. State v. Martin , 458 So.2d 454 (La. 1984) ; State v. Wade , supra.
Where an investigating officer testifies concerning events leading to the arrest of a defendant, statements made to him by others during the course of the investigation are not hearsay, if they are not offered for the truth of the matter asserted, but merely to explain the officer's actions. State v. McNair , 597 So.2d 1096 (La. App. 2d Cir. 1992), writ denied , 605 So.2d 1113 (La. 1992). In other words, where the officer does not testify with regard to the substance of what another person told him, but with regard to what he did in response to that information, the testimony is not considered hearsay. State v. Lloyd , 48,914 (La. App. 2d Cir. 01/14/15), 161 So.3d 879, writ denied , 15-0307 (La. 11/30/15), 184 So.3d 33, cert. denied , --- U.S. ----, 137 S.Ct. 227, 196 L.Ed. 2d 175 (2016).
Additionally, La. C.E. art. 803(3) permits evidence concerning the existing mental, emotional or physical condition of a declarant to be admitted at trial, even though the declarant may be available as a witness. State v. Magee , 11-0574 (La. 09/28/12), 103 So.3d 285, cert. denied , 571 U.S. 830, 134 S.Ct. 56, 187 L.Ed.2d 49 (2013). Specifically, La. C.E. art. 803(3) provides that the following is an exception to the hearsay rule:
...A statement of the declarant's then existing statement of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health),offered to prove the declarant's then existing condition or his future action. A statement of memory or belief, however, is not admissible to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's testament.
A state of mind declaration is relevant if it has a tendency to make the existence of any consequential fact more or less probative than it would otherwise be without the evidence. State v. Brown , 562 So.2d 868 (La. 1990) ; State v. Doze , 384 So.2d 351 (La. 1980). However, hearsay evidence showing the victim's state of mind for the purpose of proving the motive of the defendant is inadmissible, since its prejudicial effect on the defendant far outweighs its probative value as to the victim's state of mind. State v. Leonard, 05-42 (La. App. 5th Cir. 07/26/05), 910 So.2d 977, *447 writ denied, 06-2241 (La. 06/01/07), 957 So.2d 165.
The erroneous admission of hearsay evidence does not require a reversal of the defendant's conviction if the error is harmless beyond a reasonable doubt. Reversal is mandated only when there is a reasonable possibility that the hearsay evidence might have contributed to the verdict. State v. Wille , 559 So.2d 1321 (La. 1990), cert. denied , 506 U.S. 880, 113 S.Ct. 231, 121 L.Ed.2d 167 (1992) ; State v. Lloyd , supra.
Exceptions to the hearsay rule include dying declarations. La. C.E. art. 804(B)(2). A dying declaration is defined as "[a] statement made by a declarant while believing his that his death was imminent, concerning the cause or circumstances of what he believed to be his impending death." State v. Griffin , 01-0579 (La. 03/07/01), 783 So.2d 1241, 1241-42 ; State v. Garner , 45,474 (La. App. 2d Cir. 08/18/10), 47 So.3d 584.
The Fourth Circuit in State v. Nicholson , 96-2110 (La. App. 4th Cir. 11/26/97), 703 So.2d 173, writ denied , 98-0014 (La. 05/01/98), 805 So.2d 200, found that a statement made by a victim, even if it is made in response to a question, may be admitted as a dying declaration if it was made when the declarant was conscious of his condition and aware of his approaching demise. The court further found that the victim is not required to express an awareness of impending death, and the victim's state of mind may be inferred by the circumstances under which the statement was made. See also State v. Verrett , 419 So.2d 455 (La. 1982) ; State v. Plauche , 09-400 (La. App. 3d Cir. 01/06/10), 32 So.3d 852, writ denied , 10-0302 (La. 09/24/10), 45 So.3d 1070.
The testimony from Cooks, Alvarez, and Cpl. Pickett establish the victim's state of mind prior to her death and thus fall within exceptions to the hearsay rule. Ms. West's statements to all three witnesses were not being offered for the truth of the matter asserted. Instead, the statements clearly reflected the victim's active fear of Defendant. Both Cooks and Ms. Alvarez were present when Defendant harassed Ms. West, and Cooks testified that he was present when Defendant visited Ms. West's home in the middle of the night and banged on the home's front door and windows for almost an hour. The victim not only told Cooks of her fear; Cooks also observed it firsthand. Ms. West's statement to Cooks indicating her confusion as to why Defendant kept coming around despite the restraining order further indicates her state of mind and distress caused by Defendant's continued obsessive behavior.
Ms. West's complaints to all three parties further explain why she became frantic when her mother informed her that someone had turned on the outside water spigot and why she called the police on the morning of December 6, 2014. Cpl. Pickett's testimony is also admissible because it explains her actions during the course of an investigation and was not being offered for the truth of what the victim had told her.
Lastly, Ms. West's statement to Officer Duck naming Defendant as her assailant constitutes a dying declaration and, as such, was admissible at trial. Although Ms. West made no statement acknowledging her impending death, the circumstances under which she made the declaration, lying on the ground in a pool of her own blood with a mortal stab wound to her neck and numerous other stab and slash wounds all over her body, lead to a conclusion that the victim reasonably believed *448 that she was in danger of immediate death.
This assignment is without merit.
Joinder of Offenses
Defendant argues in his pro se brief that the trial court erroneously joined the aforementioned offenses for trial. Defendant filed a pro se motion to sever the offenses on September 19, 2017. It appears that the trial court did not rule on this motion. This assignment of error is without merit, however, because there is no evidence in the record showing that the offenses Defendant complains about were actually joined for trial. The amended grand jury indictment charges Defendant with only a single count: second degree murder. The indictment makes no mention of the other offenses of which Defendant complains. Defendant acknowledges that the indictment refers only to the single, second degree murder charge, but then argues that the trial court allowed the offenses of second degree murder, cyberstalking, and stalking be joined for trial.
The only reference to these other charges occurred within the context of witness testimony. Appellate counsel raises the issue of possible La. C.E. 404(B) violations in this appeal, which were addressed above. Defendant was neither tried nor convicted of stalking and cyberstalking charges were not the subject of the trial.
This assignment is without merit.
Due Process Violations
During trial, the trial judge revealed that he knew one of the State's witnesses, Monique Bradley, but advised the parties that Ms. Bradley's testimony would not prejudice Defendant's case. Defendant argues that his case was unduly prejudiced because the trial judge, when reciting his reasons for finding Defendant guilty, cited the testimony of Monique Bradley, the witness he personally knew. Defendant further argues that his case was prejudiced because he was required to wear an orange jumpsuit, chains, and shackles during trial. Brown contends that his prison clothing predisposed witnesses to accuse him as West's attacker.
Following Ebony Morgan's testimony, the trial judge revealed that he recognized Monique Bradley mid-testimony and informed counsel. The trial judge assured the parties that there was no close relationship between himself and witness Monique Bradley, and that it would have no effect on the trial court's ability to be fair and impartial. Neither attorney objected.
Defendant's counsel failed to make a contemporaneous objection to the trial court's acquaintance with witness Monique Bradley at trial. Under La. C. Cr. P. art. 841, an irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. Because defense counsel did not object, Defendant is precluded from raising this issue on appeal.
Similarly, defense counsel did not object to Defendant's prison garb at trial. The record confirms that Defendant was wearing an orange prison jumpsuit at trial and was handcuffed through his belt. Defense counsel made no objection to Defendant's attire or his being handcuffed. However, at defense counsel's request, Defendant's handcuffs were removed so he could take notes during the proceeding. Because there was no contemporaneous objection, Defendant is precluded from raising this argument on appeal. La. C. Cr. P. art. 841 ; State v. Rogers , 98-2501 (La. App. 1st Cir. 09/24/99), 757 So.2d 655. Furthermore, Brown has not shown that his prison attire prejudiced his case.
This assignment is without merit.
*449 Appointment of Trial Counsel
Defendant next argues that the trial court erred in appointing Michelle Andrepont with the Caddo Parish Public Defender's Office as his defense counsel. Defendant alleges that at some point he presented the trial court with a copy of a complaint he had filed against Ms. Andrepont with the Louisiana Attorney Disciplinary Board alleging ineffective assistance of counsel. A copy of this complaint does not appear to be in the record.
On December 8, 2014, the trial court appointed Ms. Andrepont to represent Defendant. On November 12, 2015, Defendant filed a motion to appoint new counsel, complaining that Ms. Andrepont was ineffective. Defendant attempted to argue the motion at a hearing held on November 15, 2016. The trial court denied the motion, finding that Defendant provided no basis for appointment of new counsel. Defendant did not object to the trial court's ruling. At that same hearing, the trial court granted Defendant's motion to represent himself and appointed Ms. Andrepont as Defendant's standby counsel. On March 15, 2017, Defendant decided he no longer wanted to represent himself, and Ms. Andrepont was reappointed as his attorney.
Pursuant to La. C. Cr. P. art. 841, Defendant's failure to make a contemporaneous objection prohibits him from raising the argument on appeal. Even if Defendant properly preserved this issue for appeal, however, he failed to support these allegations with any evidence. As previously stated, Defendant failed to provide a copy of the alleged complaint filed with the disciplinary board or any indication of its outcome.
Accordingly, this assignment is without merit.
CONCLUSION
For the foregoing reasons, Defendant's conviction and sentence are affirmed.
AFFIRMED.

David Walker, a custodian of records for AT & T Wireless, testified that he provided NELOS records to investigators in the instant case. NELOS records document tracking information on a subscriber's cell phone, which provides the physical location of the phone. Walker authenticated the records provided to law enforcement, which tracked the location of cell phone numbers (318) 470-xxxx and (318) 519-xxxx. The NELOS records were admitted into evidence.