PITMAN, J.
After a jury trial, Defendant Taurean Lamar Thomas was found guilty of second degree battery and possession of a firearm by a convicted felon. He was sentenced as a fourth-felony offender to life imprisonment without benefit of probation, parole or suspension of sentence on the battery conviction, and to 20 years, also without benefits, on the conviction for possession of a firearm by a convicted felon. For the following reasons, Defendant's convictions and sentences are affirmed.
FACTS
On June 29, 2017, Defendant was charged by amended bill of information with the second degree battery of Ronald Reddix in violation of La. R.S. 14:34.1, and possession of a firearm or carrying a concealed weapon by a convicted felon in violation of La. R.S. 14:95.1. Both offenses were committed on June 22, 2016. A jury trial was held from September 25-27, 2017. The following evidence was adduced at trial.
Reddix's sister, Debra Reddix, testified that she received a call on June 22, 2016, from someone who told her that her brother was hurt and that she would find him at the house next door to her Aunt Sharon's house on E. 74th Street, Shreveport, Louisiana. Debra testified that upon arriving at her aunt's house, she saw her aunt in her yard, along with her next-door neighbor, Anzio Lee, and her brother seated behind the wheel of his green Ford F150 truck "laid over and I guess unconscious."
Debra further testified that she tried to wake up her brother by shaking him and that Reddix would mumble and then pass out again. She stated that Lee asked her to move her brother's truck from his driveway, so she drove it a block away. When she opened the door, her brother's head "kind of fell out" and that was when she saw a knot the size of an orange with blood around it at the base of the back of his head. She called 911, but her brother refused the aid of emergency services when the ambulance arrived. The police also *1003 came to the scene and attempted to speak to Reddix, but he was incoherent. She testified that Reddix's girlfriend, Michelle McCoy, took him to the hospital. She stated that she had no knowledge of Reddix having hearing issues prior to the June 22, 2016 incident.
McCoy testified that she had been in a relationship with Reddix for about 11 years. She stated that she received a call from Debra, who informed her that something had happened to Reddix. She confirmed that she met Reddix and Debra at E. 75th Street and that, at that point, Reddix was in the passenger side of his truck with "his head down, his eyes closed. All he would say was yes or no." She saw that Reddix's nose was bleeding. She testified that when she took Reddix to the hospital, she also saw that he had a bloody swollen knot on his head.
Officer Leona Gray of the Shreveport Police Department ("SPD") testified that she responded to a call on June 22, 2016, at E. 75th Street, where she met Reddix and McCoy. She witnessed that Reddix had a large knot on the back of his head "the size of a baseball" and that his speech was sluggish. Since the knot on the back of his head was so large, she suggested to McCoy that she take Reddix to the hospital, even though he had declined treatment by EMS.
Reddix testified that he knew Defendant and owed him about $ 20. He also testified that he knew Lee from the neighborhood and that he went to Lee's house on E. 74th Street to "hang out" on June 22, 2016. He stated that he had beer and whiskey prior to arriving at Lee's house, but that he had not used drugs for at least a few days prior to June 22, 2016. He confirmed that he drove a green Ford F150 truck. He stated that he first saw Defendant outside Lee's house in the front yard, where Defendant mentioned the debt he owed him and that it became a "hostile environment." He stated that he "had been drinking" and had "probably said some bad things." He further stated that he wanted to defuse the situation.
Reddix further testified that Defendant was about five to six feet away from him and that he tried to leave because he felt outnumbered by Defendant and Lee. He stated that no punches were thrown; but when he tried to get back to his truck, the "lights went out." The next thing he remembered was the emergency personnel, but did not remember getting into the truck or how he got to the hospital. He stated that it was morning when he went to Lee's house around 9:00-10:00 a.m., and he did not get to the hospital until nighttime. He was in ICU for two days. He also testified that he lost hearing in his right ear and could hear only ringing in that ear. He acknowledged that his memory was incomplete regarding the June 22, 2016 incident and admitted that he may have pushed Defendant in order to put distance between the two.
Lee testified that he had known Reddix for about 15 years and that he had known Defendant for six to eight months prior to the June 22, 2016 incident. The prosecutor asked Lee questions about his prior criminal history, which he denied remembering. This history included a conviction for felony theft in 1991, armed robbery and a conviction for the manufacture/distribution of a Schedule II CDS in 2003. He claimed that he had "caught a little light stroke, man, so my memory just ain't all that for (sic ) way back when." When questioned if he had any other criminal convictions, he replied, "I don't want to lie to you. I don't know what you're talking about."
Lee further testified that on the evening of June 22, 2016, Defendant arrived at his house first and Reddix arrived about 20 minutes later. Defendant confronted Reddix *1004 about the money he owed him, saying, "I want my money," and "Where my money?" Lee testified that Reddix then "swung on" Defendant, but he ducked and was not struck. Defendant then punched Reddix three to four times in the face. Lee stated, "Ronald Reddix had looked at me and then he looked at defendant. He fell on his butt and then he throwed his head back real hard." Lee admitted that when he gave a statement to SPD officers on June 27, 2016, he told them something different, i.e., that Reddix tried to grab Defendant's shirt and then Defendant struck Reddix four times with a closed fist. He also told them that before Defendant struck Reddix, he said, "Give me my money, bitch" and that Reddix intentionally "threw his head into the street."
Lee further testified that he asked Reddix if he needed an ambulance, and Reddix said no. He stated that after Reddix was on the ground, he and Defendant recorded a video, which he claimed was his own idea. When asked if he told SPD it was Defendant's idea to record the video, he said he did not remember. When asked if he told SPD that he believed he could not do anything about the video because Defendant had a gun, he replied, "Well, yeah."
The state introduced a video into evidence which depicted Defendant standing in the driveway of a home between two cars, with a third car and a green truck parked in the driveway behind him.[1] Reddix appears in the video, lying down on the driveway, and he seems to be unconscious when the video begins. Defendant is standing in front of Reddix, rapping, "Why you make me do that?" Defendant also states, "I'm the real deal, Evander Holyfield." Defendant looks around and then pulls what appears to be a handgun from the rear waistband of his shorts, shows it to the camera and states, "I got iron." At one point in the video, Defendant turns to Reddix and states, "Why you make me do you this? I just got out. He duckin' me. I hurtin' bad. I need my money." Defendant continues to rap and states, "Hit you on your chin and make you holler, bruh." Near the end of the video, Reddix starts to move while lying in the driveway. Defendant is seen smiling and laughing in the video.
Lee further testified that Defendant did not take anything out of Reddix's pocket and confirmed that he gave the same statement to the SPD. Defendant asked him for "two soups" and left after he got them. He also stated that he and his neighbor, Sharon, helped Reddix up and put him in his truck. Reddix was "a little dazed" and "in and out." He added that when he and Sharon were helping Reddix to his truck, Reddix fell on his head twice-"Every time he fall, he just fall straight on his head."
Lee denied that Defendant stated that he might shoot Reddix while Reddix was unconscious. When asked, "Do you recall telling [SPD] that the reason you didn't call the police is because [Defendant] could have shot you," Lee responded, "I don't remember." When asked, "Did you tell [SPD] that the reason you did not help [Reddix] is because, quote - that you, quote, can't fight no gun," he responded, "I don't remember, sir." He testified that it was his idea to put the video on Facebook and when asked why he wanted to do that, he stated, "I caught a little light stroke, and I don't remember too much ... Only thing I can remember really is what had happened in the yard. And I don't remember why."
*1005 Lee affirmed that he approached Reddix and asked him to drop the charges against Defendant. He stated, "I was asking him why did he-is he pressing charges when he know he started it." He confirmed that he posted messages on Facebook, stating, "Man knocked out in my yard yesterday, died this morning," "Playing with people money," and "Rob him, too." When asked what he meant by the "rob him, too" Facebook message, he responded, "I don't know. Didn't nobody get robbed or nothing." He advised that he gave his statement to officers at the SPD, and he was under the impression that he could have been arrested.
SPD Sergeant Kevin Strickland testified about the interview he had with Lee on June 27, 2016, regarding the incident between Reddix and Defendant. Parts of the audio recording of the interview were played in court. In that recording, Lee stated that Defendant approached Reddix asking about money. Reddix then grabbed Defendant's shirt, and then Defendant hit Reddix about four times and Reddix fell to the ground. Lee stated that he did not know if Reddix hit his head then or when he was transferred to his truck. He saw that Defendant had a gun when he was fighting with Reddix. He stated that a video was made just after the incident and that it was Defendant's idea. He further stated that while Reddix was unconscious in the driveway, Defendant said he would shoot Reddix and then he went through Reddix's pockets and took about $ 8.00. He further stated that he did not believe he could call the police with Defendant there because Defendant had a gun. He and Sharon put Reddix in his truck and asked him several times if he wanted an ambulance. Reddix repeatedly answered, "No." He further stated that Defendant did not hit Reddix with the gun and did not point the gun at anyone.
The trial court recognized Dr. Hai Sun as an expert in neurology, who testified about the injuries sustained by Reddix when he came to the hospital on June 22, 2016. Dr. Sun confirmed that Reddix had a subarachnoid hemorrhage caused by trauma without loss of consciousness, meaning, Reddix had a brain bleed from the rupture of an artery on the surface of his brain. He stated that such an injury could cause pain and suffering, headaches, seizures or other conditions, and that Reddix was conscious when he arrived at the hospital.
Dr. Sun further testified that Reddix also had skull fractures to his occipital and temporal bones, a maxillary fracture to his face and a scalp contusion, with swelling and blood under his scalp. He stated that Reddix's injuries could have caused him to lose consciousness and could have affected his speech, hearing or memory. He also stated that Reddix had cannabis and cocaine in his system.
Kenneth McBroom was called by the state to establish Defendant's connection with his missing firearm. He testified that he had been married to Mary McBroom, who passed away on June 16, 2016. He stated that he kept a Taurus PT, 12 rounds, 9mm handgun in a holster near their bed at home and that Mrs. McBroom knew where the gun was kept. He had cleaned the gun about three days before his wife's death and discovered shortly after her death that the gun was missing. He provided the Caddo Parish Sheriff's Office ("CPSO") with photos of the box that the gun came in, the gun and its serial number and the gun's booklet. He examined a still picture taken from the video, shot by Lee, which showed Defendant holding a gun and confirmed that it resembled his own gun. He further confirmed that his gun had not been recovered.
CPSO Detective Keith Fox ("Det. Fox") testified about his role in investigating *1006 Mrs. McBroom's death, stating that she was found deceased on June 16, 2016, in her Jeep in the 12000 block of Keithville-Keatchie Road in Keithville, Louisiana. It was determined that her cause of death was a single gunshot wound to the chest and was ruled a suicide. The firearm and her purse were missing from the Jeep. Mr. McBroome advised him that his 9mm Taurus Pt 111 gun was missing and provided him with the serial number for the gun.
Det. Fox further testified that on the date of Mrs. McBroom's death, he made contact with Defendant, whom he saw across the street from where her body was found in her car. Defendant did not give any statements at the scene, but agreed to be interviewed by him. He stated that he spoke with Defendant twice and mirandized him on both occasions. At the first interview, Defendant said that he saw a white woman inside Mrs. McBroom's vehicle, who he thought was sleeping, but denied touching her vehicle. Defendant also said he saw a "Mexican" man nearby, and it was that man who called the police about Mrs. McBroom.
Det. Fox further testified that during his second interview with Defendant, he stated that he did touch Mrs. McBroom's car by putting his hand under his T-shirt to knock on the driver's side window, and then wiped down the window. Defendant also said he saw "purple fingers" on Mrs. McBroom's hand. Defendant denied going inside the vehicle or touching any part of the vehicle other than the driver's side window.
Det. Fox also testified that while he was investigating the McBroom case, he received a text message from SPD Detective Kelly Coffee, who sent a photo of a suspect that she was following in a case in Cedar Grove in Shreveport and informed him that there was a video of the suspect holding a handgun.[2] He stated that the photo depicted Defendant standing outside and holding a handgun in his right hand. He confirmed that the gun in the photo was very similar to the one Mr. McBroom had said was missing from his home and from Mrs. McBroom's vehicle on the day of the suicide. Det. Fox further confirmed that the gun seen in the still image from the video is different from a comparison photo of the Taurus Pt III air soft, a toy or pellet gun, that the state produced and showed to him.[3]
CPSO Detective John Colvin, a crime scene investigator, testified about the circumstances of Mrs. McBroom's death. He stated that there was no outside damage or signs of forced entry to her vehicle. A bullet, caliber unknown, was found on the inside of the back portion of the driver's seat. Mrs. McBroom was found in the driver's *1007 seat, unresponsive, and the door to the vehicle was unlocked. He testified that he lifted prints from the rear passenger door handle, the hood and the front driver's side door of the vehicle.
CPSO Corporal John McCain testified and was qualified by the trial court as an expert witness in fingerprint analysis and investigation. He stated that the palm print lifted from the exterior rear door handle of Mrs. McBroom's vehicle matched Defendant's prints. He also testified about the previously mentioned still image showing Defendant holding a firearm, but stated that the image quality was not good enough to obtain the gun's serial number.
Cpl. McCain further testified that the Taurus Pt 111 air soft toy gun looks substantially different from the Taurus Pt 111. He provided a photo of a Pt 111 air soft toy gun and advised that it shoots BBs or pellets. He stated that there is no scale for the firearm Defendant is holding in the still photo and that he did not know if there were other replica Pt 111s or other similar-looking imitation firearms. The jury was shown photographs of the Taurus Pt 111 taken from the owner's manual, along with an enlarged photograph of the gun in Defendant's hand in the still photograph taken from the video. Cpl. McCain stated that he had researched replica firearms and noted the similarities and differences between the two guns. He also provided a picture of the Pt 111 air soft toy gun and compared it with the photo from the manual.
Faith Pinerkin testified that she had lived across the street from Defendant in Keithville since childhood. She stated that she saw Defendant standing in the street outside her house on June 16, 2016. He then came over to her house and she noted that he was nervous, shaky and pacing back and forth. She observed that he was wearing a white T-shirt, and he asked to use her phone, which he had never done before. He told her that he had seen Mrs. McBroom dead in her car, that he leaned in on the car to see inside and that he then wiped his handprints off the car. She stated that Defendant also told her that he needed to use her phone "to get to the city."
Louisiana State Police Detective Rod Johnson was qualified as a firearm recognition expert over the objection of defense counsel. He stated that he was familiar with the differences between pellet and toy guns and actual firearms. He compared the still video image of Defendant holding the gun with the gun photo Mr. McBroome had provided from the manual for his Taurus Pt 111, along with a photo of a Pt 111 air soft pellet or toy gun. He stated that the Taurus Pt 111 has an adjustable rear sight, which is not seen on a pellet or toy gun. In the still image from the video he could see the trigger safety sticking forward, the cut or flute in the slide of the gun and visible roll pins, all features toy guns do not have. He stated that the double trigger (a trigger within a trigger) on the Pt 111 stood out on the video still image, and he opined that the gun Defendant was holding in the video was either a Pt 111 or Pt 140. He testified that the Pt 111 and Pt 140 were indistinguishable from each other from the outside because the only difference between the two models is the caliber of bullet each gun used. He further testified that pellet or toy guns do not have adjustable sights, a trigger safety or a "takedown" ability to repair, disassemble or clean the gun. Looking at the photo of the Pt 111 air soft toy or pellet gun, he noted that it had no trigger safety, no rear sight and no takedown lever or cut in the slide. He also noted that the toy gun had a piece of orange plastic on the end which could be removed. He stated that the state's photo of the toy gun did not *1008 necessarily represent the sum of all possible imitation Pt 111s. He further stated that he could determine how large the gun was by the hand of the person holding it in the video.
After being advised of his Fifth Amendment rights, and against the advice of his counsel, Defendant elected to testify in his own defense. He stated that on June 22, 2016, his grandmother dropped him off on E. 75th Street and he walked to Lee's house on E. 74th Street. Only Lee was present when he arrived. He testified that Reddix arrived in his truck, and he asked Reddix, "What's up with my money? I gave you $ 20 and you said you were going to give me back $ 30." He stated that "[Reddix] looked at me crazy and he just rushed me and swung. And I ducked my head and just swung three, four-three, four punches. And looked up; he was on the ground. He attacked me. He was the aggressor." He claimed that he did not want to fight Reddix.
Defendant further testified that in the video of him and Reddix he had a "pellet pop gun" that he "got from Ronnie, a dude from California I had known from the studio on the west side of the neighborhood." He stated that he had been in jail for four to five years for simple burglary of an inhabited dwelling before the incident with Reddix, that he was released on parole sometime in March 2015 and that he was still on parole when he gave a second statement to Det. Fox on June 23, 2016. He stated that in 2016 he lived in Keithville, Louisiana, at 12437 Keatchie Road.
When Defendant was questioned on June 16, 2016, regarding his statement to Det. Fox the day of Mrs. McBroom's suicide, he admitted that he first told Det. Fox that he never touched her car. He stated that he did not remember in which interview he finally admitted that he had touched her car. He also stated that he did not know if he had told Pinerkin a different story than the statement he initially gave to Det. Fox.
While Defendant testified that he did touch Mrs. McBroom's vehicle, he stated that he never tried to open the vehicle door. He opined that his fingerprints were on the rear passenger handle because he was leaning on the car to see what had happened to her. He testified that he did not see anything on the dash of her car.
In his testimony, Defendant insisted that he had a "pellet pop gun" with an "air gauge" on the bottom of the gun in the video with Reddix. When asked if he knocked out Reddix, he replied, "He attacked me. He was unconscious." When asked if he called the police, he stated that although Lee had told him to leave, he told Lee to call the police and that he would stay because he had not been the aggressor-that Reddix had attacked him.
Defendant further testified that it was Lee's idea to make the video and that the gun was too small to be the Taurus Pt 111. He stated that he returned the gun to "Ronnie" after he made the video. He also stated that he did not know the extent of Reddix's injuries when the video was made.
The 12-person jury returned a unanimous verdict of guilty as charged as to both counts.
On December 6, 2017, the state filed a fourth-felony habitual offender bill against Defendant, which included the following information regarding Defendant's previous convictions:
1. 2016 second degree battery conviction, which was Defendant's fourth-felony offense.
2. On January 24, 2006, pled guilty in Docket No. 243,564, to simple burglary and was sentenced to two *1009 years at hard labor suspended, with two years of supervised probation, which was Defendant's first predicate felony conviction.
3. On October 15, 2009, pled guilty in Docket No. 279,466, to simple burglary and was sentenced to two years at hard labor, which was Defendant's second predicate felony conviction.
4. On April 11, 2011, pled guilty in Docket No. 290,519, to simple burglary of an inhabited dwelling and was sentenced to eight years at hard labor which was Defendant's third predicate felony conviction.
On January 29, 2018, Defendant filed a motion for post-verdict judgment of acquittal. On that same day, the trial court denied his motion and he pled not guilty to being a habitual offender.
On March, 5, 2018, Defendant's habitual offender hearing and sentencing were held and he was adjudicated a fourth-felony offender. He was sentenced to life imprisonment without benefit of probation, parole or suspension of sentence. On the felon in possession of a firearm conviction, he was sentenced to 20 years without benefits, to run concurrently with his life sentence, with no fine or court costs. He was advised of his post-conviction relief time limits and right to an appeal.
Defendant now appeals.
DISCUSSION
Sufficiency of the Evidence: Second Degree Battery
Defendant argues that the evidence presented at trial was insufficient to prove he committed second degree battery because the state failed to prove he intended to inflict serious bodily injury upon Reddix. He contends that Reddix was the first aggressor in the conflict and that Reddix did not know who had hit him from behind after their initial confrontation. He asserts that there was no evidence presented at trial showing that he did anything other than defend himself against Reddix, or that he beat Reddix in a particularly severe manner. He further asserts that Lee testified that Reddix initiated the fight and appeared to strike his head intentionally on the ground after the altercation. He argues that the evidence failed to prove that Reddix suffered serious bodily injury. He also argues that Reddix tested positive for two illegal substances in his system, which would explain his behavior and physical condition on the day of the altercation.
The state argues that Defendant intended to cause serious bodily injury to Reddix by striking him four times in the face and knocking him unconscious onto the concrete, causing him to suffer blood loss in the back of his head and permanent hearing loss in his right ear.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed. 2d 560 (1979) ; State v. Tate , 01-1658 (La. 5/20/03), 851 So.2d 921, cert. denied , 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed. 2d 248 (2004) ; State v. Brown , 52,266 (La. App. 2 Cir. 9/26/18), 256 So.3d 431, writ denied , 18-1797 (La. 3/25/19), 267 So.3d. 597. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford , 05-0477 (La. 2/22/06), 922 So.2d 517 ; Brown , supra ; State v. Dotie , 43,819 (La. App. 2 Cir. 1/14/09), 1 So.3d 833, writ denied , *1010 09-0310 (La. 11/6/09), 21 So.3d 297. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith , 94-3116 (La. 10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. Brown , supra .
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. Brown , supra . The trier of fact is charged to make a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness; the reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. State v. Casey , 99-0023 (La. 1/26/00), 775 So.2d 1022, cert. denied , 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed. 2d 62 (2000).
In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. Brown , supra .
La. R.S. 14:34.1 provides, in part:
A. Second degree battery is a battery when the offender intentionally inflicts serious bodily injury [.]
...
(3) 'Serious bodily injury' means bodily injury which involves unconsciousness, extreme physical pain or protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty, or a substantial risk of death.
Second degree battery is a specific intent crime and, therefore, the evidence must show that the defendant intended to inflict serious injury. State v. Fuller , 414 So.2d 306 (La. 1982) ; State v. Linnear , 44,830 (La. App. 2 Cir. 12/9/09), 26 So.3d 303. Specific intent is that state of mind that exists when the circumstances indicate the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. State v. Linnear , supra . The determination of whether the requisite intent is present in a criminal case is for the trier of fact, and a review of this determination is to be guided by the standards of Jackson v. Virginia , supra . State v. Jackson , 51,575 (La. App. 2 Cir. 9/27/17), 244 So.3d 764 ; State v. Linnear , supra .
Viewed in the light most favorable to the prosecution, the testimony from Reddix, Lee and Defendant shows that Defendant hit Reddix in the face three to four times and that he also likely hit him in the back of his head after he turned to leave. The jury clearly found Reddix's testimony more credible than Lee's or Defendant's. Furthermore, Reddix sustained fractures to his skull and face, causing unconsciousness, a hospital stay in the ICU and hearing loss in his right ear. While Reddix may have tried to grab Defendant's shirt, or as he testified, put space between Defendant and himself, Defendant used excessive force beyond what the situation required; he then made a video which shows Reddix lying unconscious on the ground while he stands in front of him rapping, smiling and laughing. We find that the evidence is legally sufficient to uphold the conviction of second degree battery.
Therefore, this assignment of error is without merit.
Sufficiency of the Evidence: Possession of a Firearm by a Convicted Felon
Defendant argues that the state did not prove beyond a reasonable doubt *1011 that the object he possessed in the video was "designed to fire or is capable of firing fixed cartridge ammunition or from which a shot or projectile is discharged by an explosive." He contends that because the weapon the state calls a firearm had not been located at the time of trial, the jury was unable to examine it to determine if it was genuine. He further contends that the state produced testimony about visual features of the "firearm," but did not produce evidence that it was designed to fire or was capable of firing.
The state argues that this court has held that La. R.S. 14:95.1 does not require that the firearm in question be operable. It contends that what Defendant is actually asking this court to do is reweigh the evidence and assess the credibility of the witnesses' testimonies. It asserts that the gun Defendant was holding in the video was similar in size and shape to Mr. McBroome's missing firearm and that the replica toy gun pictured looked substantially different from the one Defendant held in the video. It argues that the jury heard and weighed all of the evidence and convicted Defendant of possession of a firearm by a convicted felon.
La. R.S. 14:95.1 states, in part:
A. It is unlawful for any person who has been convicted of ... simple burglary ... [or] burglary of an inhabited dwelling to possess a firearm or carry a concealed weapon.
...
D. For the purposes of this Section, "firearm" means any pistol, revolver, rifle, shotgun, machine gun, submachine gun, black powder weapon, or assault rifle which is designed to fire or is capable of firing fixed cartridge ammunition or from which a shot or projectile is discharged by an explosive.
To convict a defendant of possession of a firearm by a convicted felon, the state must prove beyond a reasonable doubt: (1) the possession of a firearm; (2) a previous conviction of an enumerated felony; (3) absence of the ten-year statutory period of limitation; and (4) general intent to commit the offense. La. R.S. 14:95.1 ; State v. Husband , 437 So.2d 269 (La. 1983) ; State v. Morris , 43,522 (La. App. 2 Cir. 9/17/08), 996 So.2d 306. The statute does not require the firearm to be operable. State v. Felder , 36,228 (La. App. 2 Cir. 8/14/02), 823 So.2d 1107, citing State v. Rogers , 494 So.2d 1251 (La. App. 2 Cir. 1986), writ denied , 499 So.2d 83 (La. 1987).
In State v. Powell , 15-0218 (La. App. 4 Cir. 10/28/15), 179 So.3d 721, writ denied , 15-2166 (La. 11/7/16), 208 So.3d 897, the defendant was convicted of illegal use of a firearm and of being a felon in possession of a firearm. Witnesses testified that they saw the defendant fire a gun at them. The defendant claimed he fired a paintball gun at the witnesses and he produced a paintball gun to the police. The police also found spent shell casings at the scene. Although they searched the defendant's house, no firearm was found. Despite this fact, the defendant was found guilty of the two charges and the convictions were upheld on appeal.
In State v. Hawkins , 52,086 (La. App. 2 Cir. 8/15/18), 253 So.3d 899, writ denied , 18-1590 (La. 3/25/19), 267 So.3d 594, the defendant shot at a house, and the police recovered .380 shells near the house and days later found a 9mm handgun in the yard of a home a few blocks from the scene of the alleged shooting. The defendant was not found with a gun on his person; and, despite conflicting testimony, a jury found the defendant guilty of the firearm charge. This court upheld the defendant's conviction of possession of a firearm by a convicted felon.
*1012 Evidence presented at trial shows that Defendant pled guilty to simple burglary of an inhabited dwelling in 2011. Defendant was seen near Mrs. McBroom's car on the day of her suicide, and his fingerprints were found on the door handle of her car. Lee testified that he saw Defendant with a gun, and the video shows Defendant pull out what appears to be a handgun similar in appearance to Mr. McBroome's missing handgun. Det. Johnson testified as to the similarities between the gun Defendant is holding in the video and the photo Mr. McBroome provided of his missing Taurus Pt 111. It is clear, when looking at the still shot of Defendant holding the firearm, that it is distinctly dissimilar to the photo produced by the state of the Pt 111 air soft toy gun. We find that the evidence presented at trial was sufficient to uphold Defendant's conviction for possession of a firearm by a convicted felon.
This assignment of error is without merit.
Habitual Offender Adjudication
Defendant argues that the trial court applied a ten-year, instead of five-year, cleansing period when adjudicating him a fourth-felony habitual offender. He contends that the law in effect at the time the state filed the habitual offender bill against him stated that the cleansing period was five years. He also contends that one of the felonies used to adjudicate him a fourth-felony offender was also used to convict him of possession of a firearm by a convicted felon, which amounts to impermissible "double counting" of his felonies. Lastly, he argues that the state failed to produce evidence of when he was discharged from state custody or supervision in order to prove that the cleansing period had not lapsed.
The state argues that the law in effect regarding the cleansing period for habitual offender adjudications was the law in effect when the offense was committed, and any changes to the Habitual Offender Law were prospective only. It asserts that Defendant's prior felonies were not "double counted," because the trial court only enhanced Defendant's second degree battery conviction-not his conviction for possession of a firearm by a convicted felon. Lastly, it argues that it was not required to prove Defendant's discharge date when less than ten years have elapsed between his last conviction and his subsequent conviction. It contends that trial testimony proved that Defendant was still on parole when Det. Fox made contact with him on June 23, 2016, which Defendant confirmed in his testimony.
At the time of Defendant's offense, La. R.S. 15:529.1 stated, in part:
A. Any person who, after having been convicted within this state of a felony ... shall be punished as follows:
...
(4) If the fourth or subsequent felony is such that, upon a first conviction the offender would be punishable by imprisonment for any term less than his natural life then:
(a) The person shall be sentenced to imprisonment for the fourth or subsequent felony for a determinate term not less than the longest prescribed for a first conviction but in no event less than twenty years and not more than his natural life; or
(b) If the fourth felony and two of the prior felonies are felonies defined as a crime of violence under R.S. 14:2(B), a sex offense as defined in R.S. 15:540 et seq. when the victim is under the age of eighteen at the time of commission of the offense, or as a violation of the Uniform Controlled Dangerous Substances Law punishable by imprisonment for ten *1013 years or more, or of any other crime punishable by imprisonment for twelve years or more, or any combination of such crimes, the person shall be imprisoned for the remainder of his natural life, without benefit of parole, probation, or suspension of sentence.
...
B. The current offense shall not be counted as, respectively, a second, third, fourth, or higher offense if more than ten years have elapsed between the date of the commission of the current offense or offenses and the expiration of the maximum sentence or sentences of the previous conviction or convictions, or between the expiration of the maximum sentence or sentences of each preceding conviction or convictions alleged in the multiple offender bill and the date of the commission of the following offense or offenses. In computing the intervals of time as provided herein, any period of parole, probation, or incarceration by a person in a penal institution, within or without the state, shall not be included in the computation of any of said ten-year periods between the expiration of the maximum sentence or sentences and the next succeeding offense or offenses.
A 2017 amendment to La. R.S. 15:529.1 reduced the cleansing period for the predicate offenses listed in the habitual offender bill filed against Defendant from ten years to five years. 2017 La. Acts No. 257. The same amendment further provided that the change "shall have prospective application only to offenders whose convictions became final on or after November 1, 2017." A 2018 amendment further clarified the legislature's intent by adding La. R.S. 15:529.1(K)(1), which provides that "notwithstanding any provision of law to the contrary, the court shall apply the provisions of this Section that were in effect on the date that the defendant's instant offense was committed." 2018 La. Acts No. 542. Prior jurisprudence has held that the habitual offender law in effect at the time the defendant committed the underlying offense is the version that applies; amendments to the habitual offender law apply only to offenses committed after the effective date of the amendments, which is November 1, 2017. State v. Parker , 03-0924 (La. 4/14/04), 871 So.2d 317 ; State v. Floyd , 52,183 (La. App. 2 Cir. 8/15/18), 254 So.3d 38.
Defendant's second degree battery charge was committed in 2016. The trial court stated on the record that it was using the ten-year cleansing period to adjudicate him as a fourth-felony offender, the law in effect in 2016. We find that the trial court used the correct cleansing period.
This assignment of error lacks merit.
A sentence imposed for possession of a firearm by a felon may be enhanced under the habitual offender law, as long as the prior felony conviction used as an element in the firearms conviction is not also used as a prior felony conviction in the habitual offender bill of information. State v. Baker , 06-2175 (La. 10/16/07), 970 So.2d 948, cert. denied , 555 U.S. 830, 129 S.Ct. 39, 172 L.Ed. 2d 49 (2008).
The state did not enhance Defendant's conviction for possession of a firearm by a convicted felon. The habitual offender bill clearly states that Defendant's second degree battery conviction was the fourth felony. There was no enhancement of the firearm charge, and Defendant was sentenced separately for that conviction.
Therefore, this assignment of error lacks merit.
The ten-year period begins to run from the date that a defendant is actually discharged from state custody and supervision.
*1014 State v. Anderson , 349 So.2d 311 (La. 1977) ; State v. Davis , 41,245 (La. App. 2 Cir. 8/9/06), 937 So.2d 5. In a habitual offender proceeding, the state bears the burden of proving that the period of time between adjacent offenses has not expired. State v. Ignot , 29,745 (La. App. 2 Cir. 8/24/97), 701 So.2d 1001, writ denied , 99-0336 (La. 6/18/99), 745 So.2d 618.
The record in the case sub judice reflects that Defendant's last previous felony conviction preceding the second degree battery conviction was on April 11, 2011, Criminal Docket No. 290,519, in which he pled guilty to simple burglary of an inhabited dwelling and was sentenced to eight years' imprisonment at hard labor. Since the date of commission of the felony giving rise to the present conviction for second degree battery was June 22, 2016, the ten-year period which would have prevented use of the last previous conviction for the purpose of sentencing Defendant under the Habitual Offender Law could not have elapsed. The state produced the bills of information, minutes and plea colloquies for Defendant's three predicate offenses. Furthermore, both Det. Fox and Defendant testified that Defendant was on parole when he was questioned by Det. Fox regarding the June 22, 2016 incident.
On October 15, 2009, Criminal Docket No. 279,466, Defendant pled guilty to simple burglary and was sentenced to two years' imprisonment at hard labor. On January 24, 2006, Criminal Docket No. 243,564, Defendant pled guilty to simple burglary and was sentenced to two years' suspended, with two years of supervised probation. The minutes for Criminal Docket No. 243,564 show that as of July 15, 2008, Defendant was still on probation and, therefore, still under state supervision. In all of the predicate felonies used to adjudicate Defendant a fourth-felony offender, Defendant was either still under state supervision or the offense was committed within the ten-year cleansing period prior to June 22, 2016.
This assignment of error lacks merit.
ERRORS PATENT
A review of the record reveals errors patent. First, the trial court failed to order that Defendant's life sentence and 20-year sentence for possession of a firearm by a convicted felon be served at hard labor as required by La. R.S. 15:529.1(G) and 14:95.1(B), rendering the sentences illegally lenient. The trial court also failed to impose a mandatory fine of not less than $ 1,000 and not more than $ 5,000 as required by La. R.S. 14:95.1(B), also rendering Defendant's sentence for possession of a firearm by a convicted felon illegally lenient.
Because La. R.S. 15:529.1 and 14:95.1 are mandatory felonies requiring any sentence to be served at hard labor, the error is harmless and self-correcting. State v. Foster , 50,535 (La. App. 2 Cir. 4/13/16), 194 So.3d 674.
Regarding the failure to impose the mandatory fine, the state did not object to the error, and Defendant obviously is not prejudiced by the trial court's failure to impose the mandatory fine. Accordingly, this court will not remand the case for correction of the sentence to include such a fine. State v. Brown , 52,501 (La. App. 2 Cir. 1/16/19), 264 So.3d 697 ; State v. Reynolds , 49,258 (La. App. 2 Cir. 10/1/14), 149 So.3d 471.
CONCLUSION
For the foregoing reasons, the convictions and sentences of Defendant Taurean Lamar Thomas are affirmed.
AFFIRMED.

The video was played for the jury without audio and Lee verified that it was the video he took of Defendant with his phone. It was later played with the sound on.

Det. Coffee interviewed Defendant about the incident in the case at bar; however, the interview was not published to the jury.

After the trial was over and Defendant appealed, the state filed a notice in the record that the previously missing firearm had been recovered. The notice, filed August 17, 2018, stated that on September 27, 2107, the state prosecuted Defendant for possession of a firearm by a convicted felon and second degree battery; and, at that time, the firearm had not been recovered. On March 5, 2018, Defendant was sentenced to life in prison as a fourth felony offender. On July 23, 2018, Det. Keith Fox informed the assistant district attorney ("ADA") that the firearm used in the McBroom suicide had been recovered from under the passenger seat of a vehicle in which two men were riding following an unrelated consensual search of the vehicle. The ADA informed Defendant's trial attorney, Michael Enright, that same day via text message and later informed Defendant's appellate attorney, Christopher Hatch. Both occupants claimed ownership of the gun, which was the same gun stolen from the McBroom vehicle; both were charged with possession of a stolen firearm.